APPEAL OF MITCHELL ADVERTISING AGENCY, INC.

Docket No. 560.    Submitted December 15, 1925.    Decided March 31, 1926.

*Arnold L. Guesmer, Esq.*, for the taxpayer.
*J. Arthur Adams, Esq.*, for the Commissioner.

Before GRAUPNER and TRAMMELL.

This is an appeal from the determination of a deficiency in income and profits taxes for 1918 and 1919, amounting to $1,554.82 and $3,529.95, respectively. The deficiency results from disallowance by the Commissioner of the taxpayer's claim for classification as a personal service corporation.

FINDINGS OF FACT.

The taxpayer is a Minnesota corporation with its principal office in Minneapolis. In 1903, J. H. Mitchell, formerly employed by various concerns for the purpose of carrying on their advertising, engaged in the advertising agency business at St. Paul. In February, 1908, the taxpayer corporation was organized, and Mitchell turned over to it for stock his individual business and the property connected therewith, including about $3,000 in office furniture, accounts and other personal property, and good will, which he had built up in his business. At the time the taxpayer corporation was organized, others were taken in who took small amounts of stock, some of them paying therefor in cash and others in services. The attorney took stock for his fees for organizing the corporation. All of the stockholders, except those named below, had withdrawn from the corporation before 1918. When they left they took out what they had put in and surrendered their stock. In 1918 and 1919 the stockholders and their respective holdings were as follows:

| Stockholders. | Number of shares Jan. 1, 1918. | Number of shares Jan. 1, 1919. | Number of shares Jan. 1, 1920. |
|---|---|---|---|
| COMMON. | | | |
| J. H. Mitchell, president | 260 | 260 | 260 |
| Wm. H. Oppenheimer | 3 | 3 | 3 |
| E. W. Sann, vice president | 1 | 1 | 24 |
| F. W. Skinner, secretary | 1 | 1 | 1 |
| | 265 | 265 | 288 |
| PREFERRED. | | | |
| J. H. Mitchell, president | 65 | 45 | 15 |
| J. H. Mitchell (assigned on back of certificates to Mary E. Skinner) | 35 | 35 | 35 |
| Mary E. Skinner | 3 | 3 | 3 |
| E. W. Sann, vice president | 6 | 6 | 6 |
| G. A. Murdock, copy chief | 5 | 5 | 6 |
| | 114 | 94 | 65 |
| Total stock outstanding, common and preferred, as per balance sheets | 379 | 359 | 353 |

The compensation paid officers and stockholders for services during 1918 and 1919, was as follows:

| | 1918 | 1919 |
|---|---|---|
| J. H. Mitchell | $5,040.00 | $8,000.00 |
| E. W. Sann | 3,135.51 | 4,968.75 |
| G. A. Murdock | 2,400.00 | 3,000.00 |
| F. W. Skinner | 2,400.00 | 3,857.27 |
| Total | 12,975.51 | 19,826.02 |

During 1918 the taxpayer paid to 21 employees, who were not stockholders, compensation in the amount of $14,353.77. During

1919 it had 41 employees, to whom salaries amounting to $25,239.32 were paid.

Thirty-five shares of preferred stock were assigned by Mitchell to Mary E. Skinner, wife of F. W. Skinner. One certificate for three additional shares was made out to Mary E. Skinner. F. W. Skinner made arrangements for the acquisition of the stock, retained the certificates in his possession, and in 1920 surrendered them and received new certificates for common stock in his own name. All of the corporation's dealings were with Skinner and not with Mrs. Skinner. The understanding between Skinner and the corporation was that the preferred stock was to be issued temporarily and that later common stock was to be issued to him, which was done in 1920.

The taxpayer, during both years involved in this appeal, was engaged in the business of advertising, and in carrying on that business rendered service in giving advice as to advertising and sales policies; planning advertising and sales campaigns; selecting advertising media; preparing advertising copy and supplying the copy to the media and seeing that it was run correctly and properly the correct number of times; measuring the advertising and checking bills for space received from the advertising media; collecting from advertisers the amounts of the bills and remitting amounts due to the media; attending to and adjusting disputes, and giving information and keeping clients informed.

Space was ordered for advertisers. Each order had to specify and did specify for what advertiser it was ordered. It could not be used by the taxpayer, nor could it be used by anyone else in the event it was not used according to contract, unless the publisher accepted another order for it.

The income of the taxpayer consisted of compensation paid, in part by the advertisers, in the form of special fees, but, in the main, by way of commissions allowed by publishers and others from whom space was taken, which commissions were computed at a certain rate, usually 15 per cent of the amount of the bill.

During the period involved, Mitchell, Sann, and Skinner were engaged in procuring clients and serving them along the lines above set out. More than 50 per cent of the volume of the business came from clients obtained by and who relied on Mitchell. Murdock wrote copy and was in immediate charge of the work of preparing copy. After copy had passed Murdock, it also was passed upon by Mitchell, Sann, or Skinner, whichever of them happened to be in charge of the copy under consideration. Mitchell actively and extensively entered into the work of planning copy, making criticisms, corrections, and changes.

Robert W. Foulke was employed by the taxpayer but did not work independently on his own responsibility. Mitchell actively partici-

pated in Foulke's solicitations. Foulke sought prospects whom he could contrive to have Mitchell meet. Richter was also employed by the taxpayer. He was sent by Mitchell, in specific instances, to get for him information which he used in making recommendations to clients. Copy writers worked under the supervision of Murdock. They were furnished with requisitions showing what was necessary and did detail work in writing up advertisements. Their work was inspected by Mitchell, Sann, or Skinner, who made corrections and changes, if necessary. There was also an artist, who worked under the supervision of Mitchell, and a cashier and other clerks in the office.

The balance sheets submitted with the taxpayer's returns are as follows:

|  | Jan. 1, 1918. | Dec. 31, 1918. | December, 1919. |
|---|---|---|---|
| ASSETS. |  |  |  |
| Cash | $893. 01 | $3, 725. 30 | $12, 083. 31 |
| Notes and accounts receivable | 23, 773. 88 | 28, 563. 05 | 43, 016. 37 |
| Investments | 3, 737. 59 | 4, 250. 00 | 2, 900. 00 |
| Advance to employees | 1, 737. 11 | 2, 386. 89 | 4, 125. 71 |
| Equipment | 4, 000. 00 | 2, 500. 00 | 3, 734. 82 |
| Insurance policy | 705. 55 | 1, 002. 15 | 1, 231. 21 |
| Good will | 42, 218. 69 | 42, 218. 69 | 42, 218. 69 |
|  | 77, 063. 83 | 84, 646. 08 | 109, 310. 11 |
| LIABILITIES. |  |  |  |
| Notes payable | 5, 057. 06 | 5, 604. 42 | |
| Accounts payable | 13, 966. 97 | 17, 359. 66 | 48, 106. 93 |
| Reserve | 11, 461. 10 | 12, 626. 78 | |
| Capital stock | 37, 900. 00 | 35, 900. 00 | 35, 300. 00 |
| Surplus | 8, 678. 70 | 13, 155. 22 | 25, 903. 18 |
|  | 77, 063. 83 | 84, 646. 08 | 109, 310. 11 |

In the fall of 1918 the taxpayer moved its office from St. Paul to Minneapolis and paid out a substantial sum of money in the building of walls and partitions in the new offices. The taxpayer secured loans as follows: $1,000 borrowed from the bank August 1, 1918, and repaid August 16, 1918; $1,500 borrowed from the bank August 30, 1918, and repaid October 23, 1918; $2,000 borrowed from the bank November 14, 1918, repaid, $1,000 May 7, 1919, and $1,000, July 25, 1919.

The taxpayer accepted short-time notes from 76 customers in payment for advertising space, amounting to $51,179.61 for 1918, and accepted short-time notes from 72 customers amounting to $65,-169.06 for 1919, which were indorsed by the taxpayer and deposited by it. The amounts of bills paid by the taxpayer before collections had been made from customers were approximately 20 per cent of the total business during 1918 and 18 per cent of the total business during 1919.

Contracts with publishers were made in the name of the taxpayer, although every space order was given in behalf of a named advertiser in accordance with an agreement previously made by the taxpayer with such advertisers. The taxpayer rendered bills to its customers in its own name and received bills from publishers made out to it, and when it could not collect from customers the taxpayer sustained the loss. When customers were late or slow in paying, the taxpayer paid the bills to the publishers without waiting to collect the amount. The publisher looked to the taxpayer for payment of all advertising space, and no bills were rendered by the publisher to the advertiser.

Losses sustained by the taxpayer resulting from bad debts, and claimed on its returns, amounted to $6,069.52 for 1918 and $7,641.64 for 1919. The bad debts allowed by the Commissioner were $3,755.77 for 1918 and $6,833.41 for 1919.

*The deficiencies for the years 1918 and 1919 are $1,554.82 and $3,529.95, respectively. Order of redetermination will be entered accordingly.*